*******************************************************

The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

*******************************************************

IN RE AVA M.*
(AC 46676)

Bright, C. J., and Alvord and Flynn, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the
trial court terminating her parental rights with respect to her minor
child, A. The mother first became involved with the Department of
Children and Families when F assaulted the mother's then nineteen
month old son, M. F was ultimately convicted of assault in connection
with the incident and incarcerated. Within three months of F's release
from prison, the mother reengaged with him despite the department's
repeated admonishment that the mother should refrain from doing so.
After the mother gave birth to F's child, A, she denied to the department
that she was in a relationship with F but agreed not to allow him to
have contact with A. When A was approximately four months old, the
parents were involved in an altercation and, when the mother escaped
F's grasp and locked herself in another room to telephone the police,
F kicked in the door and then left the premises. Approximately one
year later, when M was six years old, he reported that F would hit the
mother in his presence. One week later, the police responded to a 911
call from a neighbor who had reported that a little boy was screaming
at the mother's home because F was beating him. The neighbor further
reported to the police that she had overheard violent incidents between
the mother and F every night. A was removed from the mother's care
shortly thereafter, pursuant to a motion for order of temporary custody
made by the petitioner, the Commissioner of Children and Families. A
neglect petition was also filed on that same date, substantially based
on the mother's inability to provide a stable environment for A that was
free of exposure to intimate partner violence. More than one year later,
a court-ordered evaluator, C, completed a psychological evaluation of
the mother and recommended a zero tolerance policy toward the mother
having any reengagement with toxic men in her life, noting in the report
that any issue concerning the mother's reengagement with F should be
taken very seriously and was potential proof that the mother had not
internalized her treatment and did not fully understand the impact of
intimate partner violence on A. The department conveyed a zero toler-
ance policy to the mother, but she was soon involved in another instance
of intimate partner violence with another man with whom she had a
romantic relationship. M's father disclosed this incident to the depart-
ment and the mother pressured him to lie to the department and to
recant his disclosure. The petitioner subsequently filed a petition to
terminate the mother's parental rights as to A. Several months later, a
friend of the mother called the police and reported that F was causing
a disturbance at the mother's residence. F stated to the police that the
mother was his property and that he had forbidden her from being
around her friend. The mother told the responding officer that F only
occasionally spent the night at her residence and that he did not live
there. She refused to cooperate fully with the investigation, but F was
nevertheless arrested at the scene. The mother did not report this inci-
dent to the department. Several months later, police officers went to
the mother's residence in order to serve an arrest warrant on F. The
mother and F locked themselves inside the mother's vehicle and refused
to follow the officers' commands to exit the vehicle. At F's direction,
the mother attempted to evade capture but backed into the rear passen-
ger side of a police vehicle before pulling forward and parking. After
the mother and F refused to exit the vehicle, officers struck F's car
window in order to unlock his door and remove him from the vehicle.
Both the mother and F were arrested on the scene. The mother did not
disclose the incident to the department and, at the termination trial,
she testified that she was merely giving F a ride. On the first day of the
trial, the mother's counsel made an oral motion for posttermination
visitation if the petition for termination were to be granted. C testified
at trial that she had observed the mother and F carpooling to one of

the court-ordered evaluations despite her previous recommendation of a zero tolerance policy toward the mother reengaging with F. In her subsequent report, C opined that the mother lacked the capacity to understand and to meet A's needs, as evidenced by her reengagement with F. After the trial, the court issued a memorandum of decision in which it held that the department had made reasonable efforts to reunify the mother with A but that she was unable or unwilling to benefit from such reunification efforts and that termination of the mother's parental rights was in A's best interest. The court also denied the mother's motion for posttermination visitation. *Held*:

1. The respondent mother could not prevail on her claim that the trial court erred in concluding that she was unable or unwilling to benefit from the department's efforts provided to her pursuant to statute (§ 17a-112 (j) (1)) to reunify her with A; although this court recognized that the evidence in the record demonstrated that the mother was consistent in visitation, showed significant interest in A's life, and implemented skills she had learned in programs during her visits, the trial court's subordinate factual findings, which the mother did not contest, provided sufficient evidence to support that court's determination that she had failed to successfully address the primary factor that led to A's initial commitment to the petitioner's custody, namely, her inability to provide a stable environment for A free of exposure to intimate partner violence.

2. The respondent mother could not prevail on her claim that the trial court erred in finding that termination of her parental rights was in A's best interest; although the court found that A had a bond with the mother, it focused on A's need for stable, competent and reliable caretakers and found that the mother was not willing or able to fulfill that role, as her continued involvement with F made clear that she was unwilling or unable to do what it took to successfully rehabilitate within a reasonable time, that she lacked the capacity to prioritize, understand or meet the needs of A, and that she had not brought her conduct to even the minimal acceptable standards of parenting, even giving due credit to her compliance with treatment, and, because the trial court's subordinate findings that the mother was unable to provide the stable environment free from intimate partner violence that A needed were supported by clear and convincing evidence in the record, this court concluded that the trial court's findings as to A's best interest were not clearly erroneous.

3. This court concluded that the trial court did not err in denying the respondent mother's motion for posttermination visitation; although the trial court made several findings supporting posttermination visitation, including that the mother clearly desired posttermination visitation and sincerely believed that A would benefit from continued visitation, that the mother's visits with A were consistent in their timing and frequency, and that the mother had strong emotional bonds with A, that court also found that the mother continued to demonstrate issues in judgment that the court found deeply concerning, including her continued engagement with F at the risk of losing A, that the visits between the mother and A were not overwhelmingly positive such that granting posttermination visitation was necessary or appropriate, and that the record demonstrated that A was tightly bonded to her foster parents in whose care she had been for three years.

Argued November 8, 2023—officially released February 1, 2024**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Windham, Juvenile Matters, where the respondent father consented to the termination of his parental rights; thereafter, the matter was tried to the court, *Lohr, J.*; judgment terminating the respondents' parental rights and denying the respondent mother's motion for posttermination visitation, from which the respondent mother appealed to this court. *Affirmed*.

*David E. Schneider, Jr.*, assigned counsel, for the

appellant (respondent mother).

*Jennifer C. Leavitt*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (petitioner).

*Opinion*

FLYNN, J. The respondent mother, Brittany P.,[1] appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to her daughter, Ava.[2] On appeal, the respondent claims that the court erred in (1) concluding that the Department of Children and Families (department) made reasonable efforts to reunify her with Ava and that she was unable or unwilling to benefit from such reunification efforts, (2) finding that termination of her parental rights was in Ava's best interest, and (3) denying her motion for posttermination visitation. We affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our resolution of the respondent's claims on appeal. Violence caused the respondent's involvement with the department as a result of an incident in May, 2016, wherein Ava's father, Michael M., assaulted the respondent's then nineteen month old child, M, an older half-sibling of Ava. The respondent took M to a hospital but initially denied that Michael M. was caring for M at the time of the incident and told hospital staff that M had fallen in a bathtub, which explanation the hospital staff determined was incongruent with M's injuries. Ultimately, Michael M. was convicted of assault in connection with the incident and incarcerated.

As a result of this incident, the department removed M from the respondent's care. M was returned to her care in October, 2016, under protective supervision, which supervision expired in 2017. Within three months of Michael M.'s release from prison, the respondent reengaged with him despite the department's repeated admonishment that the respondent should refrain from doing so. The respondent, who has equivocated over the years as to whether she believed that Michael M. had injured M, allowed him to provide unsupervised care for M following his release from prison.

In July, 2018, Michael M. drove the respondent to a hospital to give birth to Ava but was not physically present in the hospital because, after dropping the respondent off, he overdosed on heroin in the hospital parking lot. The respondent denied to the department that she was in a relationship with Michael M. but agreed not to allow him to have contact with Ava. Ava is medically complex and was subsequently diagnosed with a laryngeal cleft, dysphagia, chronic lung disease, failure to thrive, and asthma and requires a medical device called a "G-tube," used for feeding.

Another violent incident occurred approximately four months after Ava's birth. The respondent threw a baby bottle at Michael M., who, in response, threw the bottle at the respondent's head, then pulled her to the

ground by her hair. When the respondent escaped his grasp and locked herself in another room to telephone the police, Michael M. kicked in the door and then left the premises.

An additional incident of violence occurred in December, 2019. On December 20, 2019, when M was six years old, he reported that Michael M. would hit the respondent in his presence. One week later, the police responded to a 911 call from a neighbor who had reported that a little boy was screaming at the respondent's home because Michael M. was beating him. The neighbor further reported to the police that she had overheard violent incidents between the respondent and Michael M. every night.

Ava and M were removed from the respondent's care on January 3, 2020, pursuant to motions for orders of temporary custody made by the petitioner.[3] Neglect petitions were also filed on that same date. The orders of temporary custody and the neglect petitions substantially were based on the respondent's inability to provide a stable environment for the children that was free of exposure to intimate partner violence.

A court-ordered psychological evaluation of the respondent was conducted on March 29, 2021, by Dr. Suzanne Ciaramella, who noted in the evaluation that any issue concerning the respondent's having reengaged with Michael M. should be taken "very seriously" and served as potential proof that the respondent had not internalized her treatment and did not fully understand the impact of intimate partner violence on Ava. Dr. Ciaramella recommended a zero tolerance policy toward the respondent having any reengagement with toxic men in her life. The department conveyed a zero tolerance policy to the respondent. Despite this statement, on May 12, 2021, the respondent was in a romantic relationship with John P. when she was involved in another instance of intimate partner violence with him. M's father disclosed this incident to the department and the respondent pressured him to lie to the department and to recant his disclosure. On December 21, 2021, the petitioner filed a petition to terminate the respondent's parental rights as to Ava. The custody of M, who resided with his biological father at the time of trial, was not at issue in the court's decision concerning the termination of parental rights petition for Ava.

Additionally, the court found that yet another incident of family violence occurred following the petitioner's filing of the petition to terminate the respondent's parental rights as to Ava. Marissa L., the respondent's friend, called the police on July 13, 2022, and reported that Michael M. was causing a disturbance at the respondent's residence. Michael M., who was found in the respondent's apartment, stated to the police that the respondent was "his property" and that he had forbidden her from being around Marissa L., the dispute over

which had caused their altercation. The respondent told the responding officer that Michael M. only occasionally spent the night at her residence and that he did not live there. She refused to cooperate fully with the investigation, but, nonetheless, Michael M. was arrested at the scene. The respondent did not report this incident to the department.

The July 13, 2022 incident was followed by another violent incident on November 4, 2022, when the police went to the respondent's residence in order to serve an arrest warrant on Michael M. for two counts of violation of a protective order, among other charges. The respondent and Michael M. locked themselves inside the respondent's vehicle and refused to follow officers' commands to exit the vehicle. At Michael M.'s direction, the respondent proceeded to drive the vehicle in an effort to evade capture but backed into the rear passenger side of a police vehicle before pulling forward and parking. An officer unsuccessfully attempted to deescalate the situation, but Michael M. and the respondent persistently refused to exit the vehicle. Thereafter, officers struck Michael M.'s car window in order to unlock his door and remove him from the vehicle. Both the respondent and Michael M. were arrested on the scene. The respondent did not disclose the incident to the department, and, at trial, she testified that she was merely giving Michael M. a ride and that "no good deed goes unpunished."

On January 9, 2023, at the start of the first day of the two day trial regarding the termination petition, the respondent's counsel made an oral motion for posttermination visitation. The respondent's counsel did so in the event that the court granted the petition to terminate the respondent's parental rights. As pointed out by the court in its decision, Dr. Ciaramella testified at trial that she had observed the respondent and Michael M. carpooling to the second court-ordered evaluation that was conducted in late 2022, despite her previous recommendation of a zero tolerance policy toward the respondent reengaging with him. As also noted by the court in its decision, in her report following this second court-ordered evaluation, Dr. Ciaramella opined that the respondent lacks the capacity to understand and meet Ava's needs as evidenced by her reengagement in a relationship with Michael M., which situation was, in part, the basis for why Ava previously had been removed from the respondent's custody. The court issued a memorandum of decision on May 12, 2023, in which it determined that the department had made reasonable efforts to reunify the respondent with Ava but that the respondent was unable or unwilling to benefit from such reunification efforts and that termination of the respondent's parental rights was in Ava's best interest.[4] The court denied the respondent's motion for posttermination visitation. This appeal followed. Additional facts will be set forth as necessary.

I

The respondent first claims that the court improperly determined that the department made reasonable efforts to reunify her with Ava and that she was unable or unwilling to benefit from such reunification efforts under General Statutes § 17a-112 (j) (1). Pursuant to § 17a-112 (j) (1), the petitioner must prove either that the department has made reasonable efforts to reunify or, alternatively, that the respondent parent is unwilling or unable to benefit from reunification efforts. See *In re Gabriella A.*, 319 Conn. 775, 777 n.4, 127 A.3d 948 (2015). Accordingly, because either showing is sufficient to satisfy this statutory element, we address only the respondent's claim that the court improperly determined that she was unable or unwilling to benefit from reunification efforts made by the department. See id.

"[W]e review the trial court's ultimate determination that a respondent parent was unwilling or unable to benefit from reunification services for evidentiary sufficiency, and review the subordinate factual findings for clear error. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) Id., 790.

In determining that the respondent was unable or unwilling to benefit from the department's reunification efforts, the court found that, "despite the many referrals and repeated efforts of the providers from the referral agencies, [the respondent] did not successfully address the issues [the department] identified as primary barriers to her reunification with Ava, namely, her repeated interactions with abusive men, especially [Michael M.], that resulted in her children and her being exposed to [intimate partner violence], mental and physical abuse." The respondent argues that the court improperly determined that she was unable or unwilling to benefit from reunification efforts because there was evidence that she had engaged in services, including therapy at Perception Programs, Inc., completed services such as Therapeutic Family Time, was consistent in her visitation with Ava, and was committed to working toward reunification, that all of her drug screens were negative for illicit substances, and that she maintained consistent housing, employment, and income.

We recognize that the evidence in the record shows that the department employees who worked closest with the respondent acknowledged that she was consistent in visitation, showed significant interest in Ava's life, including knowing about Ava's schooling and medical needs, and implemented skills she had learned in programs during her visits with Ava. She highlights evidence of her strides and compliance with rehabilitative

services offered by the department while discounting the uncontested subordinate factual findings of the court supporting its ultimate determination that she was unwilling or unable to benefit from reunification efforts.

In evaluating whether there is sufficient evidence to support the court's ultimate finding that the respondent was unable or unwilling to benefit from rehabilitation efforts, we do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. See *In re Gabriella A.*, supra, 319 Conn. 790. Rather, we ask whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its ultimate conclusion, and, in so doing, we construe the evidence in the light most favorable to sustaining the judgment of the trial court. See *In re Cameron W.*, 194 Conn. App. 633, 667, 221 A.3d 885 (2019), cert. denied, 334 Conn. 918, 222 A.3d 103 (2020).

The court's subordinate factual findings, which the respondent does not contest, provide sufficient support for its determination. The court's ultimate finding that the respondent was unable or unwilling to benefit from reunification efforts was supported by substantial evidence of her inability to provide a stable environment for Ava free of exposure to intimate partner violence, which factor was the primary reason that led to Ava's initial commitment to the petitioner's custody. Despite the department's repeated admonishments that the respondent refrain from reengaging with Michael M., she reengaged with him three months after his release from prison for having assaulted M. Further, after giving birth to Ava, the respondent denied being in a relationship with Michael M. and agreed not to permit him to have contact with Ava. However, despite the department's strong recommendation that she cease all contact with Michael M., she was involved in an incident wherein Michael M. struck her in the head with a baby bottle and pulled her to the ground by her hair, causing her to retreat to another room to escape and telephone the police. She was involved in another violent incident with Michael M. wherein a neighbor telephoned the police and reported that she heard Michael M. beating M and that she had heard intimate partner violence incidents between the respondent and Michael M. every night. The respondent, however, repeatedly had denied to the department that she was continuing in a relationship with Michael M. As a result of a court-ordered psychological evaluation, Dr. Ciaramella noted that "[a]ny issue that comes up with respect to [the respondent] reengaging with [Michael M.] should be taken very seriously and [is] indicative of potential proof that [the respondent] has not internalized her treatment nor does she fully understand the impact of domestic vio-

lence or intimate partner violence on her children. This should be a zero tolerance policy at this point given the repeated setbacks over the years due to her continued engagement with [Michael M.] . . . . [The department] clearly conveyed this 'zero tolerance' position to [the respondent] and was pursuing a plan of reunification of the children with the [respondent] . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) However, in 2021, the respondent was in a romantic relationship with John P., wherein she was involved in another instance of intimate partner violence. The respondent then resumed her relationship with Michael M. in 2022, after the petition to terminate her parental rights had been filed, yet continued to represent to the department that they were not in a relationship, despite clear evidence to the contrary. Due to the respondent's repeated reengagement with Michael M., despite his violent history toward the respondent and M, there was sufficient evidence to support the court's determination that she had failed to successfully address the issue that the department had identified as a primary barrier to her reunification with Ava, specifically her repeated involvement with violent and abusive men, and in particular Michael M., which involvement resulted in Ava's exposure to intimate partner violence.[5]

## II

The respondent next claims that the court erred in finding that the termination of her parental rights was in Ava's best interest. We disagree.

We will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. See *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008). During the dispositional phase, the trial court must determine whether termination is in the best interest of the child. Id., 487. According to § 17a-112 (k), in analyzing the child's best interest, the court is required to consider and make written findings regarding the seven factors delineated therein.

The respondent's argument focuses on the fourth statutory factor in § 17a-112 (k)[6] of the child's emotional ties. She contends that the court erred in finding that termination was in Ava's best interest "[g]iven the bond and the relationship that existed between the [respondent] and [Ava] as well as the damage that would likely ensue to [Ava] . . . ." She noted that Dr. Ciaramella testified at trial that completely severing the relationship between the respondent and Ava could manifest in behavioral and emotional difficulties for Ava.[7]

Although the court considered and made written findings with respect to all seven statutory factors as it was required to do under § 17a-112 (k), the respondent's argument focuses on the fourth factor of emotional

ties. Relevant to Ava's emotional ties, the court made findings that Ava visits with the respondent weekly and that the respondent has been consistent with visitation. Specifically, in the dispositional phase, the court found, regarding the fourth statutory factor concerning Ava's emotional ties, that Ava "is thriving in her foster parents' care and bonded to them. Dr. Ciaramella, the court-ordered evaluator, suggests, and the court agrees, that despite Ava being bonded to [the respondent] . . . it is time for her to have stability and permanency in her young life." Although the court found that Ava has a bond with the respondent, the existence of such a bond between parent and child is not dispositive of a best interest determination. See *In re Sequoia G.*, 205 Conn. App. 222, 231, 256 A.3d 195, cert. denied, 338 Conn. 904, 258 A.3d 675 (2021). The court also found that Ava was bonded with her foster parents. The court concluded that it was time for Ava to have stability and permanency.

In its analysis of Ava's best interest, the court focused on Ava's need for stable, competent and reliable caretakers. "In addition to considering the seven factors listed in § 17a-112 (k), [t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . Furthermore, in the dispositional stage, it is appropriate to consider the importance of permanency in children's lives." (Internal quotation marks omitted.) *In re Autumn O.*, 218 Conn. App. 424, 444, 292 A.3d 66, cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023). With respect to Ava's need for stability, the court found that the respondent was not willing or able to fulfill that role, as she "has not brought her conduct to even the minimal acceptable standards of parenting, even giving due credit to her compliance with treatment," in that "[s]he remains entwined with [Michael M.] and continues to lack insight as to the severity of [intimate partner violence] and its effect on [Ava]. Her actions with [Michael M.] as of late, which the court has carefully weighed, make clear that she is unwilling or unable to do what it takes to successfully rehabilitate within a reasonable time in the future." The court additionally found that, as it had detailed earlier in its decision, the respondent has not adjusted her personal circumstances to parent Ava. The court, earlier in its decision, had detailed that "Dr. Ciaramella succinctly opined, and the court agrees, that while [the respondent] may not have addiction issues concerning substances, she does exhibit tendencies that properly could and should be framed as an addiction to unhealthy and violent intimate partner relationships" and adopted Dr. Ciaramella's opinion that the respondent "lacks the capacity to prioritize the needs of [Ava] and put [Ava] first" and "lack[s] an understanding of [Ava's] needs and lack[s] the capacity to meet them as evidenced by [her] reengagement in a relationship with [Michael M.]

which was, in part, the basis for why [Ava was] removed previously." (Internal quotation marks omitted.) Because the court's subordinate findings that the respondent was unable to provide the stable environment free from intimate partner violence that Ava needed were supported by clear and convincing evidence on the record before us, we conclude that the court's findings as to Ava's best interest are not clearly erroneous and we will not substitute our judgment for that of the trial court.

### III

The respondent last claims that the court improperly denied her motion for posttermination visitation. We disagree.

In *In re Ava W.*, 336 Conn. 545, 248 A.3d 675 (2020), our Supreme Court held, in a case separate from the present one that involved neither Ava nor the respondent, that a trial court has the authority pursuant to General Statutes § 46b-121 (b) (1) to consider a motion for posttermination visitation and set forth, for the first time, the standard for trial courts to consider when evaluating whether posttermination visitation should be ordered within the context of a termination proceeding. Id., 569–85. That standard, as codified in § 46b-121 (b) (1), is whether posttermination visitation is necessary or appropriate to secure the welfare, protection, proper care, and suitable support of the child. Id., 580. "Our dedicated trial court judges, who adjudicate juvenile matters on a daily basis and must make decisions that concern children's welfare, protection, care and support, are best equipped to determine the factors worthy of consideration in making this finding. As examples—which are neither exclusive nor all-inclusive—a trial court may want to consider the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference with present custodial arrangements, and any impact on the adoption prospects for the child." Id., 589–90.

The necessary or appropriate standard for deciding motions for posttermination visitation "is purposefully more stringent than the best interest of the child standard, as the trial court must find that posttermination visitation is necessary or appropriate—meaning proper—to secure the child's welfare." (Internal quotation marks omitted.) *In re Annessa J.*, 343 Conn. 642, 674, 284 A.3d 562 (2022). "A more exacting standard is required in this context, particularly in light of the rare circumstance in which a trial court could simultaneously terminate parental rights and, in the same proceeding, order posttermination visitation." Id. "Whether to order posttermination visitation is . . . a question of fact for the trial court . . . ." *In re Ava W.*, supra,

336 Conn. 589. We review a trial court's exercise of authority under § 46b-121 (b) (1) for an abuse of discretion and we review a trial court's factual determinations for clear error. See *In re L. T.*, 220 Conn. App. 680, 702, 299 A.3d 1229 (2023).

In *In re L. T.*, this court disagreed with the respondent's claim that the frequency and quality of her visitation with her minor children prior to the termination of her parental rights precluded a finding that posttermination visitation with the minor children was neither necessary nor appropriate. Id., 701–705. In holding that the court did not err in determining that it was neither necessary nor appropriate for the respondent to have posttermination visitation with the minor children, this court reasoned that, "[a]lthough the respondent loves the minor children and may have had frequent and positive interactions with them, that is just one factor that the court *may* consider in evaluating whether posttermination visitation is necessary or appropriate. It was not required to do so. Moreover, even if the court did consider the nature of the respondent's previous visitation with the minor children, and agreed with her that it was frequent and positive in nature, that determination, in itself, would not have been dispositive of the required inquiry of whether posttermination visitation was necessary or appropriate. In denying the respondent's motion, the court properly considered the respondent's inability to parent the minor children and the harm that they have suffered as a result of her shortcomings. The court also explained that the respondent's combative behavior with the foster parents, and her fixation on advice that she perceives might have come from the foster parents, demonstrate her difficulty coping with visitation." (Emphasis in original.) Id., 704.

In the present case, the respondent argues that the court made findings that supported continuing visitation posttermination and that such findings are inconsistent with its ultimate determination to deny the motion for posttermination visitation. The respondent is correct that the court made several findings supporting posttermination visitation. Specifically, the court stated that the respondent clearly desired posttermination visitation and sincerely believed that Ava would benefit from continued visitation, that the respondent's visits with Ava were consistent in their timing and frequency, that the respondent had strong emotional bonds with Ava, that Ava appears to have an emotional bond with the respondent, that there was no evidence that the respondent interfered with the petitioner's or the foster parents' custody of Ava and that there was scant evidence on whether posttermination visitation would impact the prospects of Ava being adopted. There was testimony at trial that the respondent was consistent in her weekly visitation with Ava that the court credited.

In making its ultimate factual finding that posttermination visitation was not necessary or appropriate, the court, in addition to the factors weighing in favor of visitation, also considered that the respondent continued to demonstrate issues in judgment that the court found "deeply concerning," namely, she continued to engage with Michael M. at the risk of losing Ava. Further, the court noted that the visits between the respondent and Ava were "not overwhelmingly positive such that granting posttermination visitation [was] necessary or appropriate." When making findings concerning Ava's wishes, the court noted that, because Ava is under five years of age, there was no direct evidence to demonstrate her wishes but that the record demonstrated that she was tightly bonded to her foster parents in whose care she has been for three years and also bonded with the respondent. The court found that it was not clear that further work on strengthening the bond between the respondent and Ava was such that posttermination visitation was necessary or appropriate. Additionally, the court stated that Dr. Ciaramella generally opined that, although cessation of visitation could have a negative effect on Ava, the issue should be "significantly guided . . . by Ava's foster parents and/or providers who may assess how stress impacts her medically." (Internal quotation marks omitted.) Because the necessary or appropriate standard is a more stringent standard and because the court's determination of whether posttermination visitation is necessary or appropriate is a factual determination, we cannot say that the court erred in denying the respondent's motion for posttermination visitation.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** February 1, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent father consented to the termination of his parental rights with respect to Ava. Because he is not involved in this appeal, our references in this opinion to the respondent are to the respondent mother.

[2] The attorney for the minor child filed a statement adopting the brief of the petitioner in this appeal pursuant to Practice Book §§ 67-13 and 79a-6 (c).

[3] As of the time of trial, M was in the custody of his biological father in another state.

[4] The court also determined that that the respondent had failed to rehabilitate under General Statutes § 17a-112 (j) (3) (B) (i). The respondent does not contest this determination on appeal.

[5] There was evidence at trial that the respondent made allegations to the department that two social workers, both of whom had been assigned to her case at one time, were sexually inappropriate toward her. There was testimony at the trial that one such social worker was on leave at the time

of the incident and no longer works for the department and that the second social worker was removed from the respondent's case the day after the allegations were made and that he also no longer works for the department. To the extent that the respondent's brief can be read so as to allege that the inappropriate conduct of the two social workers undermined her ability to benefit from reunification efforts, we are not persuaded, as there is no nexus between the acts of the social workers and her inability or unwillingness to benefit from these efforts.

[6] General Statutes § 17a-112 (k) provides in relevant part that in determining whether to terminate parental rights under this section, "the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[7] The court noted in the fact section of its decision that Dr. Ciaramella had opined in her December 12, 2022 addendum to the second court-ordered psychological evaluation that if visits with the respondent were to be stopped or reduced it is likely that Ava may experience confusion and require extra support as she adjusts to this change but that it is likely that she would be able to overcome her negative emotions with a great deal of consistent support, love, and reassurance.